**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PEYMAN PAKDEL; SIMA CHEGINI,
*Plaintiffs-Appellants*,

v.

CITY AND COUNTY OF SAN
FRANCISCO; SAN FRANCISCO BOARD
OF SUPERVISORS; SAN FRANCISCO
DEPARTMENT OF PUBLIC WORKS,
*Defendants-Appellees*.

No.     17-17504

D.C. No.
3:17-cv-03638-
RS

OPINION

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted September 13, 2019
San Francisco, California

Filed March 17, 2020

Before: Ronald M. Gould, Carlos T. Bea, and Michelle T.
Friedland, Circuit Judges.

Opinion by Judge Friedland;
Dissent by Judge Bea

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's dismissal of an action brought pursuant to 42 U.S.C. § 1983 against the City and County of San Francisco asserting an as-applied challenge to the Expedited Conversion Program, which allows property owners to convert their tenancy-in-common properties into condominium properties on the condition that the owners agree to offer any existing tenants lifetime leases in units within the converted property.

Plaintiffs purchased an interest in a tenancy-in-common property in 2009 and soon thereafter rented their portion of the property to a tenant. When the Expedited Conversion Program began, plaintiffs and their co-owners applied to convert their property and plaintiffs agreed to offer their tenant a lifetime lease as a condition of converting and duly received final approval from the City to convert. During the process, plaintiffs had several opportunities to request an exemption from the lifetime lease requirement but did not do so. Indeed, toward the end of the process, they expressly waived their right to seek such an exemption. But after securing final approval, plaintiffs requested that the City not require them to execute and record the lifetime lease or, in the alternative, that the City compensate them. Consistent with plaintiffs' previous lack of objection and their prior express agreements not to seek an exemption, the City refused plaintiffs' requests. Plaintiffs sued the City,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

contending under various theories that the lifetime lease requirement violated the Takings Clause of the Fifth Amendment. The district court dismissed plaintiffs' takings claims because they had not sought compensation for the alleged taking in state court, which then was required by *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985).

The panel first acknowledged that the state-litigation requirement has since been eliminated by *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), so it was no longer a proper basis for dismissal. Nevertheless, the panel held that because plaintiffs did not timely ask the City for an exemption from the lifetime lease requirement, they failed to satisfy *Williamson County*'s separate finality requirement, which survived *Knick* and thus continued to be a requirement for bringing regulatory takings claims such as plaintiffs' in federal court. The panel stated that plaintiffs' belated attempts to request an exemption were untimely and expressly waived. The panel therefore affirmed the dismissal of plaintiffs' takings claim as unripe.

The panel rejected plaintiffs' argument that they were exempt from the *Williamson County* ripeness requirements because the Expedited Conversion Program effects a "private" taking, benefitting private individuals rather than the public. The panel held that plaintiffs' characterization of their claim as a "private" takings claim was foreclosed by *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083 (9th Cir. 2015). The panel also rejected plaintiffs' request that the panel exercise its discretion to excuse plaintiffs from the finality requirement. The panel concluded that none of the cases plaintiffs used to argue that they should be excused from the finality requirement presented circumstances

analogous to those here, and the panel saw no reason to invent a new rationale for exercising such discretion.

Dissenting, Judge Bea stated that because the City had reached a final decision which denied plaintiffs' request to be excused from executing and recording a lifetime lease to their unit, he would vacate the district court's order dismissing the takings claim and remand the case for further proceedings.

## COUNSEL

Jeffrey W. McCoy (argued), James S. Burling, and Erin E. Wilcox, Pacific Legal Foundation, Sacramento, California; Paul F. Utrecht, Utrecht & Lenvin, LLP, San Francisco, California; Thomas W. Connors, Black McCuskey Souers & Arbaugh, LPA, Canton, Ohio; for Plaintiffs-Appellants.

Kristen A. Jensen (argued) and Christopher T. Tom, Deputy City Attorneys; Dennis J. Herrera, City Attorney; City Attorney's Office, City and County of San Francisco, San Francisco, California; for Defendants-Appellees.

## OPINION

FRIEDLAND, Circuit Judge:

In the City and County of San Francisco (the "City"), ownership of multi-unit buildings is often shared by different people through a form of property ownership known as a tenancy in common. For years, those in the City who sought to convert their tenancy-in-common property into individually owned condominium property had to apply for

permission to do so through a lottery system.  Because conversion rights were granted through the lottery to only a very limited number of properties each year, a backlog developed.  To clear that backlog, the City temporarily suspended the lottery in 2013 and replaced it with the Expedited Conversion Program ("ECP"), which allowed a tenancy-in-common property to be converted into a condominium property on the condition that its owner agreed to offer any existing tenants lifetime leases in units within the converted property.

Peyman Pakdel and Sima Chegini (collectively, "Plaintiffs") purchased an interest in a tenancy-in-common property in 2009 and soon thereafter rented their portion of the property to a tenant.  When the ECP began, Plaintiffs and their co-owners applied to convert their property.  Plaintiffs initially advanced through the application process without a hitch: They agreed to offer their tenant a lifetime lease as a condition of converting and duly received final approval from the City to convert.  During this process, they had several opportunities to request an exemption from the lifetime lease requirement but did not do so.  Nevertheless, at the eleventh hour, they balked.  Refusing to execute the lifetime lease they had offered to their tenant, Plaintiffs instead sued the City, contending under various theories that the lifetime lease requirement violates the Takings Clause of the Fifth Amendment.

The district court dismissed Plaintiffs' takings claims because they had not sought compensation for the alleged taking in state court, which was required by *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985).  That state-litigation requirement has since been eliminated by *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), so it is no longer a proper

basis for dismissal.  But because Plaintiffs did not ask the City for an exemption from the lifetime lease requirement, they failed to satisfy *Williamson County*'s separate finality requirement, which survived *Knick* and thus continues to be a requirement for bringing regulatory takings claims such as Plaintiffs' in federal court.  We therefore hold that their takings challenge is unripe, and accordingly affirm.[1]

## I.

### A.

Tenancy in common is a form of shared property ownership in which "each owner has an equal right to possession and use of the entire property."  Marcia Rosen & Wendy Sullivan, *From Urban Renewal and Displacement to Economic Inclusion: San Francisco Affordable Housing Policy 1978-2014*, 25 Stan. L. & Pol'y Rev. 121, 134 n.57 (2014).  In San Francisco, many multi-unit buildings are co-owned as tenancies in common.  *See* Carolyn Said, *Strangers Sharing Mortgages*, SFGate (Aug. 25, 2005), https://www.sfgate.com/realestate/article/Strangers-sharing-mortgages-Many-would-be-2645563.php.  Co-owners of such properties can "make agreements among themselves[] to give each owner an exclusive right" to occupy or use a particular unit within the building.  *Tom v. City & County of San Francisco*, 16 Cal. Rptr. 3d 13, 16 (Ct. App. 2004).  In a condominium, by contrast, "each owner has exclusive ownership and possession of a single unit and common

---

[1] Plaintiffs asserted other constitutional claims as well, which the district court dismissed with prejudice.  We address Plaintiffs' appeal of the dismissal of those claims in a concurrently filed memorandum disposition.  Plaintiffs also asserted state law claims, which the district court dismissed as procedurally barred.  Plaintiffs have not appealed the dismissal of those claims.

ownership only for the common areas."  Rosen & Sullivan, *supra*, at 134 n.57.

Owners of tenancy-in-common units may hope to convert those units into condominiums in order to attain superior title and improved credit opportunities. Condominium owners in San Francisco may also derive significant economic value from selling their properties after conversion because, in contrast to most tenancy-in-common properties, condominiums are not subject to the City's rent control laws once sold by the converting owner.

In 2009, Plaintiffs purchased a tenancy-in-common interest in a six-unit San Francisco building (the "Building"), which, by agreement with their co-owners, afforded Plaintiffs the right to exclusively use one unit (the "Unit"). They rented the Unit to a tenant, intending to move in themselves when they retired.  Plaintiffs also contracted with their co-owners to take all steps available to convert the Building into condominiums, which would allow them to gain independent title to their respective units.

At the time Plaintiffs purchased and rented out the Unit, the City granted condominium conversion rights using a lottery system.  Under the lottery system, only 200 units were granted permission to convert each year, and a considerable backlog of conversion applications accumulated.  In 2013, the San Francisco Board of Supervisors acted to clear this backlog by enacting Ordinance 117-13 (the "Ordinance"), which suspended the conversion lottery until 2024 and replaced it with the ECP. The ECP allowed property owners to convert their tenancy-in-common properties into condominium properties subject to an application fee and certain conditions.  Most notably, the ECP required owners who did not occupy their units themselves and instead rented to tenants to furnish

incumbent tenants with "a written offer to enter into a life time lease" for the converting unit (the "Lifetime Lease Requirement").   S.F. Subdivision Code § 1396.4(g)(1).[2] Owners who extended a lifetime lease were entitled to a partial refund of the ECP application fee.   *See* S.F. Subdivision Code § 1396.4(h).   The Lifetime Lease Requirement was designed to mitigate an adverse effect that the City feared would result from the accelerated conversion of tenancy-in-common properties into condominium properties under the ECP—"a large number of tenants [displaced] into a very expensive rental housing market."  In other words, the ECP sought to achieve the City's objective of temporarily allowing more condominium conversions while also limiting the displacing effects of such conversions.

In 2015, Plaintiffs and their fellow Building owners submitted an ECP application to the San Francisco Department of Public Works (the "Department").  Following a public hearing, the Department approved their tentative conversion map in January 2016.[3]   In November 2016, Plaintiffs signed an agreement with the City committing to offer a lifetime lease to their tenant, and in fact offered their tenant such a lease.  In that agreement, Plaintiffs specifically "covenant[ed] and agree[d] that [they] w[ould] not seek a waiver of the provisions of the [ECP] applicable to the Lifetime Lease Units" after that stage of the approval

_____

[2] A similar, but narrower, requirement existed under the lottery system.  Converting owners were required to offer lifetime leases to tenants aged 62 or older and to permanently disabled tenants.  *See* S.F. Subdivision Code § 1391(c).  There were also some limits on rental rates and increases for units occupied by such tenants.  *See id.*

[3] A "tentative map" is "a map made for the purpose of showing the design of a proposed subdivision."  S.F. Subdivision Code § 1309(k).

process.  In exchange for offering the lifetime lease, Plaintiffs sought and received a partial refund of the ECP application fee.  *See* S.F. Subdivision Code § 1396.4(h). Their final conversion map was approved in December 2016.

Until that point, Plaintiffs had given the City no indication that they objected to the Lifetime Lease Requirement.  But on June 9 and again on June 13, 2017— six months after they secured final approval to convert— Plaintiffs "requested that the City not require them to execute and record the lifetime lease," or "in the alternative to compensate them for transferring a lifetime lease interest in their property."  Consistent with Plaintiffs' previous lack of objection to the Lifetime Lease Requirement and their prior express agreement not to seek a waiver of ECP requirements after November 2016, the City refused both requests.

**B.**

Instead of executing and recording the lifetime lease, Plaintiffs sued the City in federal district court, asserting an as-applied challenge to the Ordinance under 42 U.S.C. § 1983.  The Complaint alleged that the Lifetime Lease Requirement effects a regulatory taking of Plaintiffs' property without just compensation in violation of the Takings Clause.[4]  Because the Ordinance contains a clause

---

[4] Plaintiffs alleged in the alternative that the Lifetime Lease Requirement effects an exaction, a physical taking, and a private taking. But because these alternative theories plainly fail as a matter of law, we analyze Plaintiffs' takings challenge as a regulatory takings claim.  The Lifetime Lease Requirement is not an exaction under *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994), because it is "a general requirement

providing that the filing of any legal challenge to the Lifetime Lease Requirement triggers a suspension of the entire ECP with respect to tenant-occupied units for the duration of the litigation, this lawsuit has halted the City's processing of ECP applications for properties with tenant-occupied units since June 2017.

The district court granted the City's motion to dismiss Plaintiffs' Complaint because Plaintiffs had not sought compensation for the alleged taking of their property through a state court proceeding. Plaintiffs timely appealed.

## II.

We review de novo grants of motions to dismiss. *Naruto v. Slater*, 888 F.3d 418, 421 (9th Cir. 2018). "We may affirm the district court's dismissal on any grounds supported by the record." *Tritz v. U.S. Postal Serv.*, 721 F.3d 1133, 1136 (9th Cir. 2013).

---

imposed through legislation," rather than "an individualized" requirement to grant property rights to the public imposed as a condition for approving a specific property development. *McClung v. City of Sumner*, 548 F.3d 1219, 1227–29 (9th Cir. 2008), *abrogated on other grounds by Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013). And the Lifetime Lease Requirement does not amount to a physical taking because Plaintiffs voluntarily applied for conversion under the ECP. *See Yee v. City of Escondido*, 503 U.S. 519, 527 (1992) ("The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land."); *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) (law limiting the rent that utility companies could charge for leasing space on utility poles to cable television operators was not a physical taking because the utility companies "voluntarily entered into [the] leases with [the] cable company tenants"). Finally, as explained below, Plaintiffs' private takings claim is simply a reframing of their regulatory takings claim.

**III.**

"Constitutional challenges to local land use regulations are not considered by federal courts until the posture of the challenges makes them 'ripe' for federal adjudication." *S. Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir. 1990). In *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the Supreme Court articulated two independent ripeness requirements for regulatory takings claims. First, under the finality requirement, a takings claim challenging the application of land-use regulations was "not ripe until the government entity charged with implementing the regulations ha[d] reached a final decision regarding the application of the regulations to the property at issue." *Id.* at 186. Second, under the state-litigation requirement, a claim was not ripe if the plaintiff "did not seek compensation [for the alleged taking] through the procedures the State ha[d] provided for doing so." *Id.* at 194.

**A.**

The district court dismissed Plaintiffs' takings challenge under the state-litigation requirement. While this appeal was pending, however, the Supreme Court in *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), eliminated that requirement. The Court held in *Knick* that "[t]he Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner." *Id.* at 2170. Accordingly, a plaintiff need not seek compensation in state court to ripen a federal takings claim. *Id.*

In light of *Knick*, Plaintiffs' failure to seek just compensation in state court no longer bars them from

bringing their takings claim in federal court in the first instance.

## B.

The City nevertheless maintains that Plaintiffs' takings claim is unripe under the first *Williamson County* requirement, which prohibits a plaintiff from filing suit "until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." 473 U.S. at 186. *Knick* left this finality requirement untouched, so that aspect of *Williamson County* remains good law. *Knick*, 139 S. Ct. at 2169 ("Knick does not question the validity of this finality requirement, which is not at issue here."); *see also id.* at 2174 (noting that *Williamson County* "could have been resolved solely on the . . . ground that no taking had occurred because the zoning board had not yet come to a final decision"); *Campbell v. United States*, 932 F.3d 1331, 1340 & n.5 (Fed. Cir. 2019) (recognizing that the finality requirement "remains good law under *Knick*"). Plaintiffs do not contend otherwise; they instead argue that they satisfied the finality requirement. We agree with the City, however, that Plaintiffs' takings claim remains unripe because they never obtained a final decision regarding the application of the Lifetime Lease Requirement to their Unit.

## 1.

*Williamson County* illuminates the rationale for and scope of the finality requirement. There, a county planning commission disapproved a landowner's proposed plat for developing a tract of land after determining that the plat violated various zoning regulations. 473 U.S. at 181. Local government entities "had the power to grant certain variances" from the zoning regulations that would have

resolved many of the commission's objections to the plat. *Id.* at 188. Yet the landowner did not seek such variances. *Id.* Instead, the landowner brought suit in federal court alleging that the commission's application of the zoning regulations amounted to a taking of the property. *Id.* at 182. The Supreme Court held that the takings claim was not ripe in part because factors central to determining whether a regulatory taking occurred—such as "the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations"—"simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Id.* at 191. *Williamson County* thus made clear that the finality requirement "is compelled by the very nature of the inquiry" required in a takings case. *Id.* at 190.

The Court has further emphasized that the finality requirement "responds to the high degree of discretion characteristically possessed by land-use boards" in granting variances from their general regulations with respect to individual properties. *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 738 (1997). In light of "such flexibility or discretion," courts cannot make "a sound judgment about what use will be allowed" by local land-use authorities merely by asking whether a development proposal "facially conform[s] to the terms of the general use regulations." *Id.* at 738–39; *see also MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986) (explaining that "[a] court cannot determine whether a regulation has gone 'too far' until it knows how far the regulation goes," which requires "a final and authoritative determination" of how the regulation will be applied to the property in question). And "[b]y requiring [a plaintiff] to seek recourse at the local level" before bringing a federal

takings claim, the finality requirement "enable[s] us to respect principles of federalism which counsel in favor of resolving land use disputes locally." *Guatay Christian Fellowship v. County of San Diego*, 670 F.3d 957, 979 (9th Cir. 2011).

Accordingly, under *Williamson County*, "a final decision exists when (1) a decision has been made 'about how a plaintiff's own land may be used' and (2) the local land-use board has exercised its judgment regarding a particular use of a specific parcel of land, eliminating the possibility that it may 'soften[] the strictures of the general regulations [it] administer[s].'" *Adam Bros. Farming, Inc. v. County of Santa Barbara*, 604 F.3d 1142, 1147 (9th Cir. 2010) (alterations in original) (quoting *Suitum*, 520 U.S. at 738–39). This rule means that a plaintiff must "meaningful[ly]" request and be denied a variance from the challenged regulation before bringing a regulatory takings claim. *S. Pac. Transp. Co.*, 922 F.2d at 503. But "[t]he term 'variance' is not definitive or talismanic; if other types of permits or actions are available and could provide similar relief, they must be sought." *Id.*; *see also, e.g.*, *McMillan v. Goleta Water Dist.*, 792 F.2d 1453, 1455, 1457 (9th Cir. 1986) (holding that a takings claim became ripe when the plaintiffs' request for an exemption from a moratorium on new water connections was denied by the water district). Plaintiffs who "have foregone an opportunity to bring their proposal" to use their property in a manner that diverges from the regulation alleged to effect a taking "before a decisionmaking body with broad authority to grant different forms of relief" therefore "cannot claim to have obtained a 'final' decision." *S. Pac. Transp. Co.*, 922 F.2d at 503.

**2.**

The San Francisco Department of Public Works is a decisionmaking body with broad authority over condominium conversions in the City, including discretion to grant relief from conversion requirements. *See* S.F. Subdivision Code § 1312(a) (vesting discretion in the Director of Public Works to "authorize exceptions to any of the substantive requirements set forth in [the Subdivision] Code and in the Subdivision Regulations" upon "application by the subdivider"); Cal. Gov't Code § 66473.5. Plaintiffs, however, did not ask the Department for an exemption from the Lifetime Lease Requirement during the ECP approval process, even though they concededly had opportunities to do so.

Plaintiffs could have sought an exemption at or leading up to the January 7, 2016 public hearing held on their conversion application. Before that hearing, as required by local and state law, Plaintiffs and their Building co-owners submitted a tentative conversion map for the City's approval. *See* S.F. Subdivision Code § 1303(c); Cal. Gov't Code § 66473.5. The tentative conversion map included a promise to extend lifetime leases to existing tenants, without noting any objection from Plaintiffs to that condition of conversion.

The City notified Plaintiffs and the public that in the twenty days before the Department's proposed decision on the tentative map, any interested party could raise objections. *See* S.F. Subdivision Code § 1396.4(c)(2) (providing that "any interested party may file a written objection to [a conversion] application" before the Department rules on a tentative map); Cal. Gov't Code § 65009(b)(1) (providing that interested parties may challenge a map application at "the public hearing or in written correspondence delivered

to the public agency prior to, or at, the public hearing"). Again, Plaintiffs did not object to the requirement that their proposed plan include an offer of a lifetime lease.

It appears that Plaintiffs could also have objected to the Lifetime Lease Requirement by appealing the Department's approval of the tentative map. *See* S.F. Subdivision Code § 1314(a) ("The proposed subdivider[] or any interested party may appeal to the Board [of Supervisors] from a final decision of the Director [of Public Works] approving, conditionally approving, or disapproving a Tentative Map."). The notice of tentative approval sent to Plaintiffs informed them of their right to appeal, stating: "This notification letter is to inform you of your right to appeal this tentative approval. IF YOU WOULD LIKE TO FILE AN APPEAL OF THE TENTATIVE APROVAL: You must do so in writing with the Clerk of the Board of Supervisors within ten (10) days of the date of this letter." Plaintiffs, however, did not even attempt to appeal.

Plaintiffs do not dispute that they gave no indication of any reservations about the Lifetime Lease Requirement despite having had these opportunities to request an exemption. To the contrary, after allowing each objection period to lapse, they forged ahead with the conversion process and entered into a written agreement with the City to provide a lifetime lease to their tenant, in which they expressly waived their right to thereafter seek an exemption from the Lifetime Lease Requirement. Plaintiffs also applied for and received from the City a partial refund of the ECP application fee—a refund only available to property owners who offered lifetime leases to their tenants. *See* S.F. Subdivision Code § 1396.4(h). It was not until six months after Plaintiffs had obtained final approval of their conversion map, and seven months after they had committed

to offering a lifetime lease in exchange for the benefits of conversion, that they finally asked "the City not [to] require them to execute and record the lifetime lease."

The dissent asserts that Plaintiffs' belated attempts to request an exemption satisfied the finality requirement.[5] Dissent at 26. But by that point, Plaintiffs' request was untimely and expressly waived. Takings plaintiffs cannot make an end run around the finality requirement by sitting on their hands until every applicable deadline has expired before lodging a token exemption request that they know the relevant agency can no longer grant. In *Williamson County*, the Supreme Court expressly rejected the landowner's position that it could satisfy the finality requirement by

---

[5] We note that Plaintiffs themselves did not even advance this argument until their supplemental reply brief, where it was mentioned in passing in a footnote. In the same footnote, Plaintiffs suggested that any request for an exemption would have been futile because "the City had no discretion to waive the lifetime lease requirement." They offered no argument or evidence to substantiate this assertion; they cited only section 1396.4(g) of the Ordinance, which says nothing about depriving the City of discretion to waive the Lifetime Lease Requirement. In light of the City's open-ended solicitation of objections to the conversion application, we cannot assume that an exemption request would have been futile.

We have no examples before us of exemptions from the Lifetime Lease Requirement, but that does not mean exemptions would have been unavailable. Because Plaintiffs' lawsuit halted the ECP for all tenant-occupied properties, the City has not had any opportunities to consider exemption requests. Moreover, given that the Lifetime Lease Requirement was animated by concerns of widespread displacement of tenants, it is possible that the City would have been more amenable to exemption requests from individual owners, like Plaintiffs, who were seeking to convert a single unit that they planned to move into themselves, than from landlords who sought to convert multiple properties.

"request[ing] variances from the Commission . . . *after* the Commission approved the proposed plat," which would have been too late under the commission's regulations. 473 U.S. at 190. That the commission would still theoretically have had the power to grant a variance after plat approval was apparently immaterial to the Court's analysis. The Court explained that the landowner's "refusal to follow the procedures for requesting a variance" was fatal to its contention that "the Commission's disapproval of the preliminary plat was equivalent to a final decision that no variances would be granted." *Id.*

Moreover, we have held in the analogous context of the then-binding state-litigation requirement that when a plaintiff missed deadlines or failed to comply with other requirements for ripening a federal takings claim, the claim must be dismissed. *See Daniel v. County of Santa Barbara*, 288 F.3d 375, 381 (9th Cir. 2002) ("[T]he failure of [the plaintiffs] to seek just compensation meant that they never created ripe federal takings claims," and such failure "cannot now be cured because the applicable state limitation periods have long since expired."); *see also Pascoag Reservoir & Dam, LLC v. Rhode Island*, 337 F.3d 87, 96 (1st Cir. 2003) ("[A takings] claimant cannot be permitted to let the time for seeking a state remedy pass without doing anything to obtain it and then proceed in federal court on the basis that no state remedies are open." (quoting *Gamble v. Eau Claire County*, 5 F.3d 285, 286 (7th Cir. 1993))). Other courts of appeals have reached similar conclusions. *See Liberty Mut. Ins. Co. v. Brown*, 380 F.3d 793, 799 (5th Cir. 2004) ("By failing to utilize available state remedies for obtaining compensation, [the plaintiff] has prevented itself from meeting the second ripeness requirement of *Williamson County*. Further, because the three-year prescriptive period for an inverse condemnation action [under state law] has now expired, . . .

[the plaintiff] has permanently prevented the claim from ever ripening."); *Pascoag Reservoir*, 337 F.3d at 94 (similar); *Vandor, Inc. v. Militello*, 301 F.3d 37, 39 (2d Cir. 2002) (similar); *Gamble*, 5 F.3d at 286 (similar); *Harris v. Mo. Conservation Comm'n*, 790 F.2d 678, 681 (8th Cir. 1986) (similar).

The rationale for such a rule was straightforward: If a plaintiff could have bypassed the (then-existing) state-litigation requirement and "obtain[ed] jurisdiction in the federal courts simply by waiting until the statute of limitation bars the state remedies," the state-litigation requirement would have been meaningless. *Pascoag Reservoir*, 337 F.3d at 95 (quoting *Harris*, 790 F.2d at 681). This rationale applies with equal force to the finality requirement. Allowing a takings claim to proceed when a variance or exemption was not requested at the proper junctures would undermine the purposes of the finality requirement by eliminating local officials' opportunities to exercise discretion and by presenting federal courts with ill-defined controversies. *See Guatay Christian Fellowship*, 670 F.3d at 977 ("[T]he final decision requirement . . . is the sole means by which a court can know precisely how the regulation at issue would finally be applied to the property" in question, and "accords with principles of federalism . . . by encouraging resolution of land use disputes at the local level."); *see also FERC v. Mississippi*, 456 U.S. 742, 767 n.30 (1982) ("[R]egulation of land use is perhaps the quintessential state activity."). The dissent does not explain how the finality requirement can retain any force if a takings claim brought by a plaintiff who made no attempt to follow the prescribed procedures for obtaining a final decision can be considered ripe. By allowing property owners to bypass state and local governments' processes for making land use decisions, the dissent's approach would subvert principles of

comity and federalism. *Williamson County* prohibits us from going down that path. *See* 473 U.S. at 186–91.

Plaintiffs protest that requiring them to have sought an exemption through the prescribed procedures amounts to imposing an administrative exhaustion requirement in the guise of a finality requirement. It is true that, in general, "there is no requirement that a plaintiff exhaust administrative remedies before bringing a § 1983 action." *Williamson County*, 473 U.S. at 192. But the Court in *Williamson County* nevertheless held that, in the takings context, a property owner's failure to seek a variance through procedures made available by the local land-use authority meant that the authority had not reached a final decision. *See id.* at 193. The Court explained that the finality requirement would have been satisfied only by a "conclusive determination" by the local land-use authority "whether it would allow [the property owner] to develop the [parcel of land] in the manner [the owner] proposed." *Id.* at 193. Here, Plaintiffs never "proposed" that the City exempt them from the Lifetime Lease Requirement. They gave the City no inkling that they wanted an exemption, and therefore gave it no opportunity to exercise its "flexibility or discretion" to grant such an exemption. *See Suitum*, 520 U.S. at 738. At bottom, Plaintiffs' argument is that because they ignored the finality requirement for long enough, it no longer applies to them. As *Williamson County* made clear, that is not correct. 473 U.S. at 190 ("[I]n the face of [the property owner's] refusal to follow the procedures for requesting a variance, . . . [the owner] hardly can maintain that the Commission's disapproval of the preliminary plat was equivalent to a final decision that no variances would be granted.").

Instead of attempting to ripen their claim during the proper course, Plaintiffs knowingly waived their right to seek an exemption. We therefore affirm the dismissal of Plaintiffs' takings claim as unripe.**[6]**

**3.**

Plaintiffs offer two further arguments in an attempt to save their takings claim from dismissal, neither of which is persuasive.

**a.**

Plaintiffs first argue that, even if their regulatory takings claim is unripe, their first cause of action—which alleges that the ECP effects a "private" taking because it benefits private individuals rather than the public—is exempt from the *Williamson County* ripeness requirements. We disagree.

---

**[6]** The dissent contends that dismissing Plaintiffs' takings claim on the ground that they have foregone their opportunity to ripen it "is a merits ruling rather than one about ripeness." Dissent at 27. Certainly, the contingent nature of Plaintiffs' interest in condominium conversion would tend to undermine their claim that the conversion effected a taking. *See Bowers v. Whitman*, 671 F.3d 905, 913 (9th Cir. 2012) (explaining that there is no taking "if the property interest [at issue] is contingent and uncertain or the receipt of the interest is . . . discretionary" (quotation marks omitted)). But as cases like *Daniel* and *Pascoag Reservoir* illustrate, the consequence of the failure to timely ripen a takings claim is that the claim must be dismissed before its merits can be evaluated. *See Pascoag Reservoir*, 337 F.3d at 96 (affirming dismissal of takings claim with prejudice because the plaintiff's "failure to bring a timely suit for compensation under state law has led to the forfeiture of its federal taking claim."); *Daniel*, 288 F.3d at 381 (affirming dismissal of takings claim with prejudice because "the failure of [the plaintiffs] to seek just compensation meant that they never created ripe federal takings claims").

Even if some category of "private" takings claims could be exempt from the finality requirement, which is a question we need not decide,[7] Plaintiffs' characterization of their claim as a "private" takings claim is foreclosed by *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083 (9th Cir. 2015). In that case, a mobile home park (Rancho) alleged that the City of Calistoga's mobile home rent-control ordinance, which limited the magnitude of annual rent increases, effected "an unconstitutional private taking because any purported 'public use' [was] pretextual." *Id.* at 1092. Rancho insisted that the "real purpose" behind the ordinance was to provide rent subsidies to mobile home tenants, which violated the Supreme Court's admonishment in *Kelo v. City of New London*, 545 U.S. 469 (2005), that "the sovereign may not take the property of A for the sole purpose of transferring it to another private party B." *Rancho de Calistoga*, 800 F.3d at 1092–93 (quoting *Kelo*, 545 U.S. at 477). We explained, however, that, where no physical seizure such as that in *Kelo* had occurred, a private takings claim alleging "public takings motivated by a 'private purpose'" was "simply a renaming of [a] regulatory takings claim." *Id.* at 1092 (citation omitted). That is, Rancho's argument was an attempt to "refram[e]" its challenge to an alleged regulatory taking as a private takings claim "through an attack on the stated purposes of the rent-control scheme." *Id.* at 1092–93.

---

[7] Plaintiffs cite only precedent holding that "a plaintiff alleging [a private] taking would not need to seek compensation in state proceedings before filing a federal takings claim" under the state-litigation requirement of *Williamson County*. *Armendariz v. Penman*, 75 F.3d 1311, 1320 n.5 (9th Cir. 1996) (en banc), *overruled in part on other grounds as recognized in Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851 (9th Cir. 2007).

Plaintiffs' private takings theory fails for the same reason.  Like Rancho, they allege that the Lifetime Lease Requirement is "intended to favor a particular private party with only incidental or pretextual public benefits."  Also like Rancho, Plaintiffs argue that "the City has taken their property for the sole purpose of benefiting another private party" in violation of *Kelo*.  Where, as here, full possession of the property has not been seized, such a challenge is at bottom a regulatory takings claim subject to *Williamson County*'s finality requirement—which, as explained above, Plaintiffs cannot satisfy.

### b.

As a last resort, Plaintiffs urge us to excuse them from the finality requirement in this instance as an exercise of our discretion.  Because *Williamson County*'s ripeness requirements are prudential, not jurisdictional, we do have some discretion whether to impose them.  *See Guggenheim v. City of Goleta*, 638 F.3d 1111, 1118 (9th Cir. 2010) (en banc).  But none of the circumstances that prompted the exercise of discretion in the cases Plaintiffs rely on for this argument are present here.

First, there are no concerns in this case about different claims proceeding simultaneously in state and federal court, as in *Town of Nags Head v. Toloczko*, 728 F.3d 391 (4th Cir. 2013).[8]  *See id.* at 399.  Second, the City here raised the ripeness issue at the first opportunity, in contrast to the defendant city in *Yamagiwa v. City of Half Moon Bay*, 523

---

[8] Plaintiffs' non-takings claims will not generate piecemeal litigation.  As discussed in the concurrently filed memorandum disposition, Plaintiffs' unreasonable seizure, due process, and equal protection claims incurably fail as a matter of law on the merits and so were properly dismissed without leave to amend.

F. Supp. 2d 1036 (N.D. Cal. 2007), which acted in bad faith by not asserting ripeness as a defense until more than two years into the case, following the completion of trial. *See id.* at 1108. Third, this case is unlike

*Guggenheim*, in which we opted not to impose the state-litigation requirement on the plaintiffs because we concluded that their takings claim failed on the merits, "so it would [have been] a waste of the parties' and the courts' resources to bounce the case through more rounds of litigation." 638 F.3d at 1118. Plaintiffs here have urged us *not* to reach the merits of their takings claim in the first instance, because "the parties have [not had] an opportunity to develop a factual record that would allow this Court to properly analyze" the claim. The rationale of *Guggenheim* thus has no applicability in this case.

In sum, none of the cases Plaintiffs use to argue that they should be excused from the finality requirement presented circumstances analogous to those here, and we see no reason to invent a new rationale for exercising such discretion.

## IV.

For the foregoing reasons, we affirm the district court's dismissal of Plaintiffs' takings claim.

**AFFIRMED.**

BEA, Circuit Judge, dissenting:

The majority is correct about the state of the law on the "ripeness" of takings claims brought under 42 U.S.C. § 1983, in the wake of *Knick*. It remains the case that a plaintiff may not bring suit for an unconstitutional regulatory taking until "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985); *see Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162, 2169 (2019). However, because the City here has indeed reached such a final decision, I would vacate the district court's order dismissing the takings claim and remand the case for further proceedings.[1]

*Williamson County*'s "finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury," not whether a request for "variances" followed the decisionmaker's administrative procedures. *Williamson County*, 473 U.S. at 193. A takings claim is ripe if, at the moment a suit is filed, it is possible for the court to know "how far the regulation goes," that is, whether and to what degree a regulation or ordinance will be enforced against the plaintiff. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 622 (2001) (citation omitted). If the record is clear that "no variances will be granted," then the court knows the scope of the regulation, it will be enforced as written, and the claim is ripe. *Williamson County*, 473 U.S. at 191. Requiring

---

[1] I concur in the memorandum disposition filed concurrently that affirms the district court's dismissal of the Plaintiffs' other constitutional claims.

plaintiffs to adhere to specific administrative procedures for requesting "variances" from a regulation, rather than simply evaluating whether a decision about the application of a regulation is final, is not mandated by *Williamson County* and risks "establish[ing] an exhaustion requirement for § 1983 takings claims," something the law does not allow. *See Knick*, 139 S. Ct. at 2173; *see also McGuire v. United States*, 550 F.3d 903, 909–10 (9th Cir. 2008).

The majority's description of the Plaintiffs as never having "obtained a final decision regarding the application of the Lifetime Lease Requirement to their Unit," is belied by the facts. Majority Op. at 12. On June 9 and 13, 2017, the Plaintiffs specifically requested that the City excuse them from executing and recording a lifetime lease to their Unit. The City refused these requests on June 12 and 13, 2017. At least by June 13, 2017, the City's position was final. The Plaintiffs were required to execute and record the lifetime lease; there would be no variance. The majority correctly notes that the Plaintiffs made their requests to the City after several notable events had occurred: (1) they had missed the official window for appealing the tentative approval of their subdivision map; (2) they had entered into a contract with the City to offer the tenant a lifetime lease; (3) they had offered the lifetime lease to the tenant; (4) they had received a refund of $8,000 from the City in exchange for offering the tenant a lifetime lease; and (5) they had their final subdivision map approved. But none of this bears on the question whether the City had reached a final decision that required the Plaintiffs to comply with the lifetime lease requirement.[2] The City's rejections of the Plaintiffs' belated

---

[2] This is not to say that these are irrelevant considerations in evaluating the *merits* of the Plaintiffs' claims. But the limited question

requests were clear and final. Accordingly, the Plaintiffs' claim was ripe.

The majority dismisses the City's rejection of the Plaintiffs' requests to be excused from the lifetime lease requirement and the unavoidable conclusion that this was a final decision by the City, because the majority finds the Plaintiffs' requests were "untimely and expressly waived." Majority Op. at 17. But such a holding is a merits ruling, rather than one about ripeness. The proper venue for evaluating, in the first instance, whether the Plaintiffs' claim may be defeated by waiver, equitable estoppel, or any other defense is in the district court on remand. *Cf. Dodd v. Hood River County*, 59 F.3d 852, 863 (9th Cir. 1995) (reversing the district court's holding that a takings claim was not ripe but remanding to consider whether the defense of collateral estoppel applied).

The majority supports its conclusion that the Plaintiffs lost their ability to ripen their claim because they did not follow the City's administrative procedures and object earlier in the process, by citing to cases that applied the now-defunct state-litigation requirement from *Williamson County*.[3] *See* Majority Op. at 18–19. Though *Williamson*

---

here is whether the merits of the claims were ripe for review in the district court.

[3] The only Ninth Circuit case the majority references for this holding is *Daniel v. County of Santa Barbara*, 288 F.3d 375, 381 (9th Cir. 2002), which it cites for the proposition that if "a plaintiff missed deadlines or failed to comply with other requirements for ripening the claim, the claim must be dismissed." Majority Op. at 18. The majority is overreading the case. *Daniel*, beyond being about the *Williamson County* state-litigation requirement and not the finality requirement, did not involve generic "missed deadlines"; it involved the failure of plaintiffs

*County* mentioned the failure of the plaintiff to comply with regulations for requesting variances, *see* 473 U.S. at 190, it did so in a context where, unlike here, the plaintiff had requested no variance, or other relief, whatsoever. The majority has no direct authority for its holding that a request for a variance or exemption to a land-use ordinance, made and denied after the administrative deadline for filing objections, cannot satisfy *Williamson County*'s requirement that "the administrative agency has arrived at a final,

---

to commence an action for compensation within the applicable state statute of limitations. The difference is significant. Before *Knick*, failure to seek compensation through state proceedings for an alleged taking of property not only deprived a plaintiff of potential payment, it also meant that no cognizable constitutional violation had occurred. This was because a taking was not without just compensation, and thus the Fifth Amendment was not violated, until the state had denied a request to compensate a plaintiff for property taken. *See Williamson County*, 473 U.S. at 194–95, *overruled Knick*, 139 S. Ct. at 2172. Therefore, a failure to file a claim for compensation within the state limitations period was conclusive that there was no cognizable constitutional violation.

But even after *Knick*, a failure to file a takings claim in the district court within the timeframe of the state's statute of limitations bars relief, since claims brought under 42 U.S.C. § 1983 are subject to a state's statute of limitations for personal injury claims. *See Wilson v. Garcia*, 471 U.S. 261, 276 (1985). Seeking a variance from a land-use restriction beyond the deadline outlined in a city regulation or ordinance does not have the same consequence. Statutes of limitations, unlike local land-use ordinances, are not "subject to the decision[s] of a regulatory body invested with great discretion," to issue waivers or exemptions. *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 739 (1997). The only hope for a plaintiff who fails to commence an action within the period of the state's statute of limitations is that a future state legislative act will amend the statute and extend the limitations period. Whereas a plaintiff seeking a variance from a land-use ordinance after the deadline may petition a local board, possessed with great discretion, simply to consider his untimely request and grant him relief.

definitive position regarding how it will apply the regulations at issue to the particular land in question." *Id.* at 191.

Moreover, the very City ordinance that allows the majority to assume that any request to be excused from the lifetime lease requirement may not have been futile, despite all practical indications to the contrary, allows the Director of Public Works to "authorize exceptions to *any* of the substantive requirements" in the City Subdivision Code or regulations. *See* S.F. Subdivision Code § 1312(a) (emphasis added). Surely the same discretion that would have allowed the Director to excuse the Plaintiffs from the lifetime lease requirement would have also allowed the Director to treat the Plaintiffs' waiver requests as timely. At worst, it seems the Plaintiffs missed a deadline imposed by an ordinance that the City, through the Director of Public Works, had broad authority to waive. The City denied these requests for variances when they were made and has confirmed in the proceedings before us that there is nothing more that the Plaintiffs may now do to be excused from the lifetime lease requirement. By any common understanding of the word, the City's decision is final.

In sum, the Plaintiffs twice requested to be excused from the lifetime lease requirement. The City denied these requests in a final decision, and the Plaintiffs' takings claim is ripe for adjudication. The majority ignores the Plaintiffs' requests for variances from the lifetime lease requirement because of when they were made, and elevates adherence to administrative procedure above the question of whether the City has reached a final decision. Because of this error in the majority's opinion, I respectfully dissent.